UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

ASHLEY CURRY,

      Plaintiff,

  v.

MAGISTRATE SILVIA BECK, et al.,

      Defendants.

Case No. 1:25-cv-467

JUDGE DOUGLAS R. COLE
Magistrate Judge Litkovitz

## OPINION AND ORDER

Ashley Curry is a pro se litigant advancing what sounds like a serious claim. She alleges that the government, specifically, Hamilton County Job and Family Services (HCJFS), unlawfully took away her infant son. (Compl., Doc. 2, #20–22). Defendants Magistrate Silvia Beck and Carissa Cook, each government employees, allegedly participated in the process that wrongfully stripped Curry of custody. (*Id.*). But Defendants have since moved to dismiss. (Doc. 4). And Curry, despite being warned of the consequences of doing so, failed to respond. For the reasons below, the Court **GRANTS** Defendants' motion.

## BACKGROUND[1]

On May 8, 2024, Curry gave birth to a healthy baby boy, T.R., at Bethesda North Hospital. (Doc. 2, #20). After two days, social workers visited the hospital to

---

[1] Because this matter is before the Court on Defendants' motion to dismiss, the Court must accept the well-pleaded allegations in the Complaint as true. *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008). So while the Court relies on the Complaint's allegations to recount the case's background, it reminds the reader that they are just that—allegations.

ask Curry if she was homeless and about her history of mental illness. (*Id.*). On that same day, HCJFS Child Services' employee Carissa Cook also visited Curry in the hospital to "ask a few questions."[2] (*Id.*). Hospital employees had apparently called Defendant Cook, claiming that Curry was "neglecting feeding her newborn child" and that Curry said that she "heard voices in the bathroom." (*Id.*). Cook conversed with Curry and "stated everything seemed fine." (*Id.*). But Cook nonetheless asked if she could go inspect Curry's home, just to see where Curry and the child would be living. (*Id.*). Curry provided her home address and Cook left the hospital to go visit it. (*Id.*). The next day, Cook returned to the hospital and told Curry that "she looked at [her] home, everything seemed great, but something didn't seem right." (*Id.*). Cook then instructed Curry to cooperate with Child Protective Services (CPS) or the infant would be removed from her custody. (*Id.*). In other words, Curry is alleging that Cook, despite there being "no issue," forced her to cooperate with CPS. (*Id.*).

Later that same day, Cook told Curry that T.R. needed to stay with a particular distant relative. (*Id.* at #20–21). Further, to get her child back, Curry would need to satisfy a case plan by doing the following: (1) get a note from a psychiatrist stating her mental health condition, (2) demonstrate that she could get and maintain a job, and (3) show that she could get and maintain housing. (*Id.* at #21). Curry responded by contacting the FBI and police. (*Id.*). She complained to both about what she saw as a kidnapping and abduction of her child. (*Id.*). But the police allowed Cook to take

---

[2] The Complaint is unclear if Cook was the social worker who "harassed" Curry by asking if she was homeless and about her history of mental illness, or if there were two separate visits by government workers on that day.

2

the infant "through emergency custody" (although Cook does not say exactly what she means by that phrase). (*Id.*). A few days later, Defendant Magistrate Silvia Beck held an emergency custody hearing to see whether the child should be returned. (*Id.*). Cook testified. (*Id.*). At the end of the hearing, Magistrate Beck ruled against Curry and ordered T.R to remain in state custody. (*Id.* at #22). According to Curry, during Cook's testimony, Cook constantly referred to Curry's race (white, blonde hair, brown eyes). (*Id.* at #21). At one point, Cook yelled out to Magistrate Beck to "think about it" and "look at [Curry]" before making her decision, which Curry contends was a reference to her race. (*Id.* at #22). As of the filing of the Complaint, Curry's child remains in the custody of HCJFS Child Services. (*Id.*).

On June 20, 2025, over a year after losing custody of T.R., Curry initiated this action, bringing suit in Hamilton County Court of Common Pleas, (Doc. 1-3, #13), (albeit with a complaint captioned with the United States District Court for the Southern District of Ohio), (*id.* at #8). By way of relief, Curry asks for "immediate and emergency custody of [T.R.]," that Defendants be fired and jailed, waiver of fees in this case, $21 million in punitive damages, and a jury trial. (Doc. 2, #23). On July 8, 2025, Defendants, citing federal question jurisdiction, removed the matter to this Court. (Doc. 1, #1).

Curry's exact causes of action are a bit difficult to identify. She brings a claim under 42 U.S.C. § 1983 for an alleged deprivation of her rights, but declines to explain exactly what rights, although she does cite to three sections of the Ohio criminal code which criminalize kidnapping, abducting, and unlawful restraint, Ohio Revised Code

3

§§ 2905.01–3. (Doc. 2, #19–20). Defendants responded by filing a joint Motion to Dismiss (Doc. 4). There, they argue that Curry fails to plausibly allege any claims, and that in any event, both Cook and Magistrate Beck have various forms of immunity to Curry's suit. (*Id.*). Separately, while Defendants do not argue res judicata as a defense, they highlight that this appears to be Curry's second attempt to bring a claim based on this set of facts. (Docs. 4-1, 4-2 (attaching complaint and Report and Recommendations from the previous matter)). They also note that the previous matter was dismissed with *prejudice*. (Order Adopting R. & R., *Curry v. Fed. Gov't*, No. 1:24-cv-299 (S.D. Ohio July 2, 2024), Doc. 7). As is the Court's practice with pro se litigants, the Clerk sent notice to Curry of her need to respond to the motion or face potential dismissal. (*See* Doc. 5). But Curry nonetheless failed to oppose the Motion to Dismiss.

## LEGAL STANDARD

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a "complaint must present sufficient facts to 'state a claim to relief that is plausible on its face.'" *Robbins v. New Cingular Wireless PCS, LLC*, 854 F.3d 315, 319 (6th Cir. 2017) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In assessing plausibility, the Court "construes the complaint in the light most favorable to the plaintiff." *Bassett*, 528 F.3d at 430 (cleaned up).

4

A court analyzing a motion to dismiss under Rule 12(b)(6) generally must confine its review to the pleadings. *Armengau v. Cline*, 7 F. App'x 336, 343 (6th Cir. 2001). That said, the Sixth Circuit has "taken a liberal view of what matters fall within the pleadings for purposes of Rule 12(b)(6). If referred to in a complaint and central to the claim, documents attached to a motion to dismiss form part of the pleadings." *Id.* at 344.

## LAW AND ANALYSIS

**A.  The Motion to Dismiss is Unopposed.**

At the outset, the Court notes that Defendants' Motion to Dismiss is unopposed. Defendants moved to dismiss on July 10, 2025. (Doc. 4). That means Curry's response was due August 4, 2025.[3] *See* S.D. Ohio Civ. R. 7.2(a)(2); Fed. R. Civ. P. 6(d). Curry, however, did not file one. True, she is proceeding pro se, so one could perhaps argue she did not realize that the rules required a response by that date. *Layne v. Thouroughman*, No. 1:23-cv-702, 2024 WL 3068872, at *3 (S.D. Ohio June 20, 2024). But the Clerk mailed notice of the Motion to Dismiss on July 21, 2025, and that notice included an express warning that a failure to respond to the Motion to Dismiss within twenty-one days could lead the Court to dismiss the case for failure to prosecute. (Doc. 5). Six months have now passed since the Defendants filed their Motion to Dismiss. Yet, despite the clear warning, Curry has still neglected to respond.

---

[3] Under Local Rule 7.2(a)(2), Curry had twenty-one days to respond. But Defendants served their motion to dismiss on Curry by first class mail. (*See* Doc. 4, #33). So under Federal Rule of Civil Procedure 6(d), Curry had three additional days to file a response, which fell on August 3, 2025, a Sunday. Meaning, the deadline was the next day, August 4, 2025.

5

By failing to respond, Curry has "waived opposition to the motion," *Humphrey v. U.S. Att'y Gen.'s Off.*, 279 F. App'x 328, 331 (6th Cir. 2008) (quoting *Scott v. Tenn.*, 878 F.2d 382, 1989 WL 72470, at *2 (6th Cir. 1989) (Table)). While the Court could perhaps grant the Motion to Dismiss based on that alone, *see Layne*, 2024 WL 3068872, at *3–4, that would be a harsh sanction, *see Schreiber v. Moe*, 320 F. App'x 312, 317–18 (6th Cir. 2008). And so, especially considering Curry's pro se status, the Court will briefly review Defendants' arguments.

**B.    The Court Grants the Motion to Dismiss as to All of Curry's Claims.**

Defendants begin their Motion to Dismiss by arguing that the Court should dismiss Curry's claims because her conclusory allegations fail to survive Rule 12(b)(6). (Doc. 4, #27). Defendants also argue that absolute immunity, state statutory immunity, and federal qualified immunity shield Magistrate Beck and Cook from Curry's claims. (*Id.* at #28–32). The Court largely agrees. First, the Court dismisses Curry's claims under the three Ohio criminal statutes for failure to state a claim. *See* infra Part B.1. Then, the Court addresses each Defendant's immunity. *See* infra Part B.2 (Magistrate Beck) and B.3 (Cook).

    **1.    Curry's Claims for Kidnapping, Abducting, and Unlawful Restraint Fail as a Matter of Law.**

As noted above, Curry's claims are not easy to decipher. She asserts a claim under § 1983 for "deprivation of rights" but does not state the rights at issue; at the same time, she cites three Ohio criminal statutes she contends Defendants violated. (Doc. 2, #19–20). So it is not entirely clear if she is alleging that the actionable deprivation resulted from Defendants committing these crimes against her, or if

6

instead she means to advance claims under these criminal statutes *in addition to* a claim under § 1983 based on some other (unalleged) right. The Court concludes it need not get to the bottom of that quandary, though, as either approach fails. As to the first, Curry cannot rely on an alleged state law violation as the basis for a § 1983 claim. *Pyles v. Raisor*, 60 F.3d 1211, 1215 (6th Cir. 1995). As to the second, Curry cannot directly assert a claim under a *criminal* statute, at least not without asserting some other proper cause of action. *Henderson v. Parin*, No. 3:22-cv-228, 2023 WL 369954, at *3 (S.D. Ohio Jan. 24, 2023) ("Courts in Ohio have held that a plaintiff cannot assert a claim predicated upon an alleged violation of a criminal statute.") (citing *Biomedical Innovations, Inc. v. McLaughlin*, 658 N.E.2d 1084, 1086 (Ohio 1995)); *but see Jacobsen v. Kaforey*, 75 N.E.3d 203, 204–05 (Ohio 2016) (holding that Ohio Revised Code § 2307.60 independently authorizes civil actions under that statute for damages caused by criminal violations, including violations of §§ 2905.01 and 2905.03). Accordingly, the Court (1) dismisses the § 1983 claim to the extent that it relies on these three criminal statutes, and (2) dismisses Curry's claims brought under these Ohio criminal statutes, if she is indeed advancing such claims.

    **2.**    **Magistrate Beck is Entitled to Absolute Immunity.**

To the extent that her § 1983 claim is based on some other alleged violation of her rights, it runs into additional shortcomings. To start, the only factual allegation Curry makes as to Magistrate Beck is that Beck "ruled in Defendant, HCJFS Child Services' Carissa Cook's favor and kept [her] child in … custody." (Doc. 2, #22). Curry claims that by doing so, Magistrate Beck "help[ed] commit a felony" and "took part in

7

the kidnapping, abducting[,] and unlawful[] restraint" of Curry's child. (*Id.*). But ruling in a suit is an official action that Magistrate Beck took as a judge. That poses a problem for Curry. "Judicial immunity is a long-recognized common-law doctrine shielding judges from collateral attacks challenging a judge's actions taken in her official judicial capacity." *Morgan v. Bd. of Pro. Resp. of the Sup. Ct. of Tenn.*, 63 F.4th 510, 518 (6th Cir. 2023) (citing *Forrester v. White*, 484 U.S. 219, 225 (1988)). "This immunity is absolute: all of a judge's actions taken in an official judicial capacity are immune from suit." *Id.* Because Curry does not allege any facts that allow the Court to plausibly infer that Magistrate Beck acted outside her role as a judicial decisionmaker, Magistrate Beck is immune from Curry's claims. And while Defendants argue that Magistrate Beck also enjoys various other types of immunity, the Court declines to reach them because it is clear that she enjoys judicial immunity.

    **3.    Cook is Immune for Her Statements as a Witness, and the Remainder of Curry's Claims Fail.**

That leaves Cook. According to Curry, Cook conducted a child services investigation shortly after Curry gave birth. (Doc. 2, #20). Although Curry does not say exactly why, it appears that investigation led to the state assuming custody of T.R. until Curry fulfilled a case plan. (*Id.* at #21). Two days later, Magistrate Beck conducted "Court for Emergency Custody," where Cook testified, and the judge ruled against Curry. (*Id.* at #21–22). As that description makes clear, Cook took all of these actions within the scope of her employment at HCJFS Child Services. As best as the Court can tell, Curry's allegations of improper conduct by Cook consist of the fact that Cook investigated her home and "forced her to cooperate with CPS" despite there

8

being "no issue," (*id.* at #20), and that Cook's actions were motivated by race as "Curry's race (white, blonde hair, brown eyes) was constantly the topic of discussion in the court room by … Cook," (*id.* at #21).

At this point, Curry's only potential remaining claim is the (vaguely asserted) federal § 1983 claim against Cook. So, Ohio statutory immunity, of course, would not apply.[4] *Two Bridges, LLC v. City of Youngstown, Ohio*, No. 22-3506, 2023 WL 4030071, at *3 (6th Cir. June 15, 2023) (explaining that Ohio Revised Code § 2744.09(E)'s federal claims carve-out applies to § 1983 claims).

But other forms of immunity may be available, depending on the nature of Curry's claim. That is where the problem lies, though. The Court cannot identify exactly what that claim might be. That said, applying a generous construction to the Complaint (in light of Curry's pro se status), the Court sees two possibilities. Neither works.

First, Curry may be alleging that Cook violated her right to equal protection under the Fourteenth Amendment, as Curry alleges that her race was a recurring topic of discussion in the courtroom. (Doc. 2, #21–22). Certainly, Curry does possess a constitutional right to not have the state take custody of her child based on her race. But the only facts she alleges about Cook regarding Cook's reliance on Curry's race are Cook's statements during the courtroom proceedings. (*Id.*). And as Defendants point out, "all witnesses … are absolutely immune from civil liability based on their

---

[4] The Court declines to rule on the separate Ohio state law question of whether Ohio statutory immunity applies to Curry's claims for state criminal violations as those claims are dismissed for other reasons. *See* supra Part B.1.

9

trial testimony in judicial proceedings." *Moldowan v. City of Warren*, 578 F.3d 351, 390 (6th Cir. 2009) (quoting *Briscoe v. LaHue,* 460 U.S. 325, 328 (1983)). So, Cook, as a witness at the trial, is immune from liability for her testimony there.

That said, those statements perhaps could still serve as evidence that Cook took other actions *outside* the courtroom because of some racial animus, and Cook would not have testimonial immunity for those actions (if they happened). But Curry offers no allegations or arguments on that front, and the courtroom statements that she does allege are simply not enough for the Court to reasonably infer that Cook was investigating or initiating proceedings against Curry based on her race. That Curry's race was a "topic of discussion" in the courtroom, or that Cook told the judge to "look at [Curry]," are insufficient facts to plausibly allege that Cook violated Curry's right to equal protection (Doc. 2, #21–22). Nor, in any event, does Curry anywhere allege that Cook's investigation or the demand that Curry cooperate with CPS were motivated by race. (*Id.* at #20–21). So, this claim fails.

Second, Curry may be attempting to bring a claim for deprivation of her due process right to "care, custody, and control of [her] child[] … perhaps the oldest of the fundamental liberty interests recognized by this Court." *Siefert v. Hamilton Cnty.*, 951 F.3d 753, 762 (6th Cir. 2020) (quoting *Troxel v. Granville*, 530 U.S. 57, 65 (2000) (plurality opinion)). Such a claim can be substantive or procedural. *See id.* at 762, 765. Start with the latter. From what the Court can tell, the state provided Curry procedural due process. Cook conducted an investigation; CPS gave Curry a case plan; and most importantly, Magistrate Beck conducted a judicial hearing for

10

custody. (Doc. 2, #21–22). *See Eidson v. State of Tenn. Dep't of Child.'s Servs.*, 510 F.3d 631, 635 (6th Cir. 2007) (holding that a deprivation of physical custody requires a hearing within a reasonable time). So, if that is the claim Curry is pleading, it fails.

Separately, a substantive due process claim requires—alongside a deprivation of a liberty interest—government conduct that shocks the conscience. *Siefert*, 951 F.3d at 765–66. But all that Curry alleges about Cook is that she inspected Curry's home despite there being "no issue," and "forced her to cooperate with CPS"—presumably referring to the "case plan." (Doc. 2, #20–21). This does not allow the Court to infer that Cook acted "with deliberately indifferent conduct that shocks the conscience" as Cook appeared to be "pursuing a legitimate governmental purpose." *Siefert*, 951 F.3d at 767. True, if those same actions were motivated by a desire to racially discriminate against Curry, that *would* shock the conscience. But this runs into the same problems as the equal protection claim above—the only facts supporting that theory come from Cook's alleged statements at the judicial proceeding. Cook cannot be directly liable on those statements. And if the alleged statements instead are meant to serve as evidence of underlying racial animus, they fall short of plausibly alleging its existence.

And finally, because the Court has dismissed all of Curry's claims, the Court declines to wade into a qualified immunity analysis for either Defendant.

## CONCLUSION

Again, the Court notes that Curry failed to respond to the Motion to Dismiss, despite a warning from the Clerk. (*See* Doc. 5). Separately, her prior suit based on

largely the same facts—her loss of custody of T.R.—was dismissed with prejudice.[5] The Court cautions Curry from bringing further actions when her claim has now been adjudicated twice on the merits or risk more serious sanctions. *See* Fed. R. Civ. P. 11. That said, Curry's alleged harm is a very serious one: the deprivation of custody of her newborn child. But the better forum for Curry to seek relief, if those allegations have any merit, is through the appeal of Magistrate Beck's decision instead of bringing new lawsuits. For the above reasons, the Court **GRANTS** Defendants' Motion to Dismiss (Doc. 4) and **DISMISSES** Curry's Complaint (Doc. 2) **WITH PREJUDICE**. The Court **DIRECTS** the Clerk to enter judgment and to **TERMINATE** this case on its docket.

    SO ORDERED.

January 20, 2026
**DATE**

**DOUGLAS R. COLE**
**UNITED STATES DISTRICT JUDGE**

---

[5] Because the Defendants did not raise res judicata as a defense (beyond attaching the previous case as exhibits), the Court did not address it substantively. But that prior dismissal alone likely warranted dismissal.

12